In the Matter of DUNCAN & HILL REALTY, INC., Petitioner, v
DEPARTMENT OF STATE OF THE STATE OF NEW YORK et al.,
Respondents.

Fourth Department, May 19, 1978

## APPEARANCES OF COUNSEL

*Lacy, Katzen, Jones & Ryen (Peter T. Rodgers* and *Leon Katzen* of counsel), for petitioner.

*Louis J. Lefkowitz, Attorney-General (Charles Genese* and *Ruth Kessler Toch* of counsel), for respondents.

## OPINION OF THE COURT

WITMER, J.

This appeal requires us to define the extent to which real estate brokers and agents may participate in the preparation of an offer to purchase real estate and the counteroffers and acceptances thereof. The issue is presented in a CPLR article 78 proceeding requesting us to review and annul the determination of respondent, the Secretary of State, that petitioner, Duncan & Hill Realty, Inc., represented by Donald W. Bellaire, a licensed real estate broker, has demonstrated untrustworthiness and incompetence as a licensed real estate broker in violation of the provisions of section 441-c of the Real Property Law. Specifically, the charge is that petitioner, not being an attorney at law, prepared legal documents, to wit, an offer, counteroffer and acceptance, effectuating a contract to buy and sell real estate and, after the transaction fell through, illegally withheld a $200 deposit made by the buyers.

Upon receiving complaint from the buyers, respondent filed charges against petitioner and conducted a hearing thereon. The record discloses that petitioner, Duncan & Hill Realty, Inc., is a domestic corporation engaged in the general real

estate brokerage business and Donald W. Bellaire is a representative broker for the corporation. In March, 1976 Dane Emens and Julie Emens, his wife, contacted Bellaire, whom they had known, and advised him that they wished to buy a home. Bellaire knew of a home for sale at No. 2058 Ireland Road, Town of Clarkson which he showed to them. They testified that they saw two air conditioners, a bar and chairs (or stools) on the premises and asked Bellaire about them and that he assured them that those items went with the property. Bellaire testified that although those items had been in the house, the "bar stools" were removed long before the property was put up for sale. He admitted, however, that at the conclusion of signing the purchase offer, the buyers asked him to find out about the status of the bar. At the hearing Bellaire made no response with respect to the air conditioners.

On April 1, 1976 Bellaire went to Emens' apartment and filled out a purchase offer form for them to sign for the purchase of the Ireland property. The Emenses signed the offer form, as filled in by Bellaire, which set the purchase price at $22,000. It provided for a deposit of $1,320, down payment of $3,180 on the closing and the giving of a $17,500 first mortgage on the property to the seller for the balance of the purchase price, upon the following terms: The mortgage was to be amortized over 20 years but be callable in 10 years; it would bear interest at 8½% per annum; buyers would have "prepayment privilege"; taxes would be paid separately "and direct" by the purchasers, and the mortgage should contain a provision allowing a "standard default of 30 days".

Bellaire also inserted in the offer, at Emens' request, that "this offer shall included [sic] kitchen range; washer and dryer; greenhouse, metal storage shed and repair of cold water line to kitchen". He further inserted, "This offer subject to seller's attorney's approval as to form" and the provision for closing the transfer on June 1, 1976, a requirement which was important to Emens. The offer was made effective and irrevocable until April 2, 1976, and it recited that the buyers deposited with petitioner their check for $200 and note for $1,120.

Bellaire took the offer to the seller and she made a counter-offer on April 2, 1976 to accept the offer upon condition that the price be $22,900, and that her attorney approve of the buyers' credit. On the same day Bellaire took the counteroffer to the buyers who accepted it; and on the face of the offer

Bellaire changed the price to $22,900. He increased the amount of the deposit to $1,374 and reduced the down payment to $3,126, but made no change in the amount of the mortgage to effectuate the $900 increase in the price. He also changed the figure as to the amount of the note for part of the down payment to $1,174. Bellaire then went to the seller's attorney and had him initial it and approve it as to form; but no notation was made thereon of his approval of the buyer's credit.

Bellaire testified that when he returned with the counter-offer he told the Emenses to "accept, reject or counter themselves" and "that any change in the exceptions would amount to a counter". He testified that Emens asked him about the bar and he told him that it was going to a relative. He testified that the seller's attorney not only initialed approval of the contract as to form but also orally approved of the buyers' credit. Mr. Emens gave Bellaire his check for the $200 down payment, but was not asked to sign or deliver to Bellaire a note for the $1,174 balance of the down payment as provided in the purchase offer. There is no evidence that Bellaire advised the seller that the buyers had not otherwise complied with the deposit provisions (see *Matter of Grant Realty v Cuomo,* 58 AD2d 251, 255-256).

Since Emens had no attorney, Bellaire referred him to one, and Emens retained that attorney to handle his end of the transaction.

The foregoing completed the work that Bellaire did in obtaining the contract. In early May the Emenses, being desirous of moving out of their apartment at the end of the month to avoid another month's rent (and also being fearful that they might become obligated for an extended lease), sought permission to enter the house during the month of May. Although the buyers' attorney conferred with seller's attorney about the buyers' gaining early entry, and tentative arrangements, on terms, were made therefor by the attorneys, such consent and arrangement were not communicated to the buyers until after June 1.

Mr. Emens testified that when he learned that the two air conditioners, bar and chairs had been removed, he became unhappy with the deal. After June 1 he heard from his attorney that the latter wanted to see him about the transaction. However, having heard nothing about the closing on

June 1, he had assumed that the deal was off, and he so notified his attorney.

On June 4, 1976 Bellaire talked with Emens, stating that he had heard of Emens' intention to terminate the contract, and he advised him against it. Emens asked for the return of his down payment. According to Emens, Bellaire stated that although he could resell the property, he would not return Emens' down payment of $200 because Bellaire had performed his part of the bargain, that is, produced a buyer.

The purchase offer form also contained the provision that, "I agree to pay the prevailing minimum brokerage commission if I fail to keep my part of this agreement".

The seller did not attempt to hold the Emenses to the contract; and no test of its validity was ever made.

Apparently because petitioner refused to return the $200 deposit, Emens reported the matter to respondent Secretary of State and, acting upon the complaint, respondent made the charge of untrustworthiness against petitioner, out of which this proceeding arose. Respondent's determination was that petitioner "demonstrated untrustworthiness and incompetence as a real estate broker in that Donald W. Bellaire, who is not an attorney admitted to practice, did prepare legal documents and is also illegally withholding the $200.00 deposit received from Dane R. Emens and Julie W. Emens, and accordingly and pursuant to the provisions of Section 441-c of the Real Property Law of the State of New York, the real estate broker's license of the said respondent is hereby suspended until such time as the respondent, Duncan & Hill Realty, Inc., represented by Donald W. Bellaire, has presented proof satisfactory to the Department of State that it has forwarded to Dane R. Emens and Julie W. Emens the sum of $200.00, being the deposit monies presently being held by the respondent [petitioner herein]."

Whether Bellaire was entitled to retain the $200 deposit that Emens made depended upon whether the Emenses failed to keep their part of the bargain, and that in turn depended upon whether a valid purchase contract ever came into existence and also whether, if so, the provision that Emenses pay petitioner the commission upon their default was enforceable in light of evidence concerning the termination of the contract and the fact that Bellaire, although not an attorney, drafted the contract (see *Wyckoff v O'Neil,* 64 Misc 2d 333, 340).

The modifications made by Bellaire in the purchase offer

upon the acceptance of the seller's counteroffer did not indicate how the $900 increase in price was to be paid or, arguably, even that it was to be paid, and those issues, plus the dispute over whether the two air conditioners and bar and chairs were to be part of the property, present a question whether petitioner could have been successful in asserting its right to retain the down payment because of the alleged failure of the Emenses to keep their part of the bargain. At any rate, under the hammer of respondent's determination, petitioner returned the $200 deposit to Emens, and so we need not answer that question.

In this proceeding petitioner seeks to remove the cloud of an official determination that it has demonstrated untrustworthiness and incompetence in drafting the contract in question and in its actions in connection therewith.

■ A consideration of this question must start with the recognition that from time immemorial real estate brokers and agents have drafted "simple" contracts between their clients as a part of their professional work, in expediting the progress of their business and the affairs of their clients (see *People v Title Guar. & Trust Co.,* 227 NY 366, 374-375). As long as real estate brokers and agents have not held themselves out to be attorneys at law, have confined their actions to serving their clients in relation to the specific transaction (such as drawing a contract of sale) in which the broker has a financial interest for payment of his services, and have made no charge for these incidental services, such acts have been held by our courts to be proper and not to constitute the unlawful practice of law *(People v Title Guar. & Trust Co., supra; People v Title Guar. & Trust Co.,* 191 App Div 165, affd 230 NY 578; *Wollitzer v Title Guar. & Trust Co.,* 148 Misc 529, affd 241 App Div 757). It is to be noted, however, that a real estate broker serves either the seller or the buyer, usually the former, and not both; and so the reference in the cases to brokers "serving their clients" in relation to a specific transaction rests on the erroneous assumption that brokers represent both the seller and buyer in the same transaction (see *Matter of Grant Realty v Cuomo,* 58 AD2d 251, 255, *supra).*

The New York rule granting to real estate brokers and agents the privilege to prepare purchase offer contracts in real estate transactions is followed in many other States *(State ex rel. Indiana Bar Assn. v Indiana Real Estate Assn.,* 244 Ind

214; *State ex rel. Reynolds v Dinger,* 14 Wis 2d 193; *Arkansas Bar Assn. v Block,* 230 Ark 430, cert den 361 US 836; *Conway-Bogue v Bar Assn.,* 135 Col 398, 416; *Ingham County Bar Assn. v Neller Co.,* 342 Mich 214; *Hulse v Criger,* 363 Mo 26; *Keyes Co. v Dade County Bar Assn.,* 46 So 2d 605 [Fla]; *Commonwealth of Virginia v Jones & Robbins,* 186 Va 30, 43-44; *Lowell Bar Assn. v Loeb,* 315 Mass 176, 181; *Cowern v Nelson,* 207 Minn 642; *Paul v Stanley,* 168 Wash 371, 376-378, mod in *Washington State Bar Assn. v Washington Assn. of Realtors,* 41 Wn 2d 697).

The line between such permitted acts by real estate brokers and the unauthorized practice of the law has been recognized as thin and difficult to define and, at times, to discern.[1] Whether or not the services rendered are simple or complex may have had a bearing on the outcome *(People v Title Guar. & Trust Co.,* 227 NY 366, 376-377, *supra),* but it has not been controlling *(People v Lawyers Tit. Corp.,* 282 NY 513, 521, quoting from the concurring opinion of POUND, J. in *People v Title Guar. & Trust Co., supra,* p 379). The American Bar Association and the National Association of Real Estate Boards have stated principles which establish practical guidelines in this area (7 Martindale-Hubbell Law Directory 83M [1978]).[2]

The justification for granting to real estate brokers and agents the privilege to complete simple purchase and sale documents has been said to be the practical aspect of the matter, that is, the business need for expedition and the fact that the broker has a personal interest in the transaction. It should be noted in this regard, however, that the so-called

---

1. Note that the decision in *People v Title Guar. & Trust Co.* (227 NY 366, *supra)* was by a 4:3 vote, with CARDOZO, J. leading the dissent; and the difficulty in drawing that line seems to have been an important factor in the dissent.

2. Article 1 thereof provides in part as follows:

"1. The Realtor shall not practice law or give legal advice directly or indirectly; he shall not act as a public conveyancer, nor give advice or opinions * * * and he shall not * * * discourage * * * employing the services of a lawyer.

"2. The Realtor shall not undertake to draw or prepare documents fixing and defining the legal rights of parties to a transaction. However, when acting as broker, a Realtor may use an earnest money contract form for the protection of either party against unreasonable withdrawal from the transaction, provided that such earnest money contract form, as well as any other standard legal forms used by the broker in transacting such business, shall first have been approved and promulgated for such use by the Bar Association and the Real Estate Board in the locality where the forms are to be used.

"3. The Realtor shall not participate in the lawyer's fees."

"simple" contract is in reality not simple. It is often the most important legal transaction that the average person will ever undertake—the purchase of a home, and it involves very substantial legal rights which deserve the advice and guidance of a lawyer. The argument that the need for expediting such transactions justifies their consummation without reference to an attorney is specious. The protection of the interests of the parties to such contracts is sufficiently important to justify a little delay for reflection and legal advice, so as to guard against a thoughtless drafting of a hastily conceived contract.[3] The personal interest of the broker in the transaction and the fact that he is employed by one of the opposing parties are further reasons to require that, insofar as the contract entails legal advice and draftsmanship, only a lawyer or lawyers be permitted to prepare the document, to ensure the deliberate consideration and protection of the interests and rights of the parties.

 The law forbids anyone to practice law who has not been found duly qualified and licensed to do so (Judiciary Law, § 478). That law was not enacted for the benefit of lawyers but for the protection of the public *(People v Lawyers Tit. Corp., supra,* p 521; *People v Alfani,* 227 NY 334, 339). Thus, the privilege accorded to real estate brokers and agents must be circumscribed for the benefit of the public to ensure that such professionals do not exceed the bounds of their competence and, to the detriment of the innocent public, prepare documents the execution of which requires a lawyer's scrutiny and expertise *(People v Lawyers Tit. Corp., supra).*

It is noted that the purchase offer form used by petitioner in this case, apparently approved and circulated among its members by the Real Estate Board of Rochester, does not comply with those recommended by the American Bar Association, the Monroe County Bar Association or the National Conference of Lawyers and Realtors, all of which were designed, with boldface print at the top of the forms, to protect both parties to a real estate transaction and to alert them to the fact that, when signed, the instrument becomes a binding contract, and cautioning them that it is desirable for them to consult their respective attorneys before signing.[4] The caveat

---

3. The State Legislature has recognized the importance of this principle in providing for a "cooling off" period with respect to certain contracts (see Door-to-Door Sales Protection Act; Personal Property Law, art 10-A, §§ 425-430).

4. See 34 Unauthorized Practice News, 56 (Fall/Winter 1968-1969); *Wyckoff v*

*O'Neil,* 64 Misc 2d 333, 338 (Boehm, J.). The model contract form suggested by the National Conference of Lawyers and Realtors is as follows:

NOTE: The NATIONAL CONFERENCE OF LAWYERS AND REALTORS, a joint committee of the American Bar Association and the National Association of Real Estate Boards, submits the attached model form to link state and local joint committees for adoption,—provided that they deem promulgation of such a form in order,—after they shall have amended the same in such respects as may be considered proper to conform to local law and custom.

THIS IS A LEGALLY BINDING CONTRACT: ·
IF NOT FULLY UNDERSTOOD, SEEK COMPETENT ADVICE!
CONTRACT OF SALE

PARTIES:_____, hereinafter called Seller (whether one or more, male, female, or corporate), agrees to sell to _____, hereinafter called Buyer (whether one or more, male, female, or corporate), who agrees to buy from Seller the property hereinafter described upon the terms and conditions hereinafter set forth.

1. LEGAL DESCRIPTION of real estate in ____County, _____

Personal property included: _____
Street Address: _____. Said property fronts _____ feet on said street and runs back _____ feet.
Seller represents that the property can be used for the following purposes: _____

2. PURCHASE PRICE: $_____, payable as follows:
$_____ earnest money deposited with _____as escrow agent.
$_____ approximate balance of first mortgage, which Buyer assumes. Mortgage holder_____
Interest ____% per annum, payable _____.
$_____ purchase money note and mortgage to Seller. Interest ____%, payable _____.
$_____ cash or cashier's check on closing (or such greater or lesser amount as may be required after credits, adjustments and prorations).

3. ACCEPTANCE: If this contract shall not have been signed by both parties on or before _____, the party having signed may declare it void, and if Buyer, he shall receive back his earnest deposit. The date of the last signature shall be the date of this contract.

4. LOAN COMMITMENT. This contract is conditioned upon Buyer's obtaining within 30 days from its date a committment for a loan of $_____ with interest at ____% or less, and principal and interest payable together in _____ installments.

5. DAMAGE BY FIRE, ETC.: This contract is further conditioned upon delivery of the improvements in their present condition, and in event of material damage by fire or

in the instrument, therefore, is crucial because a preliminary review of it by attorneys for the prospective parties can result in producing a contract which they really desire and will be happy to perform. After the contract is signed, however, it is generally too late for an attorney to secure for a party

otherwise before closing. Buyer may declare the contract void and shall be entitled to return of his escrow deposit.

6. CONVEYANCE: The conveyance shall be by general warranty deed, signed by _____ , and shall describe the grantee(s) as follows:

_____ .

7. Seller shall furnish marketable title and shall convey the property free from encumbrances other than those named herein. Seller shall have the option of furnishing either a complete abstract of title or an Owner's Title Insurance Policy, insuring the title in the amount of the purchase price, issued by _____ .

If Seller elects to furnish title insurance, he shall place an order therefor within five days from the date of this contract. If he furnishes abstract, Buyer shall have ten days within which to submit in writing any objections to the title. In the event of title objections, either by Buyers attorney or by the title company, Seller shall have a reasonable time within which to cure them.

On Seller's failure to furnish marketable title within a reasonable time, Buyer may either cancel the contract and receive back his escrow deposit or enforce specific performance.

8. SURVEY: If a survey be required, the cost shall be paid by_____ .

9. PRORATIONS: Taxes, insurance, rents, and interest shall be prorated to the date of closing, and Buyer shall assume taxes for the current year and shall take over the unexpired fire and other casualty insurance, except _____ .

10. CLOSING: The transactions shall be closed at _____ when title objections have been met; and Seller shall have _____ days after closing within which to deliver possession.

11. COMMISSION: Seller agrees to pay_____ , the Broker who negotiated this sale, a commission of $_____; if Buyer shall default, said Broker shall be entitled to half the escrow deposit, or his full commission, whichever shall be smaller.

12. DEFAULT: On default by Buyer, Seller may return the escrow as liquidated damages or enforce specific performance. On default by Seller, Buyer may reclaim his escrow deposit, sue for damages, or enforce specific performance.

EXECUTED IN QUADRUPLICATE on the dates shown.

_____ Date _____ Date

_____ Date _____ Date

appropriate protection which would very likely have been readily granted at the bargaining stage. The insertion into such documents of provisions respecting the legal rights of the parties without a lawyer's advice may produce ill-conceived, ambiguous and unintended terms out of which may arise dissension and litigation. It is for this reason that real estate brokers and agents must refrain from inserting in a real estate purchase offer or counteroffer any provision which requires the exercise of legal expertise. Thus it is not proper for such a broker to undertake to devise the detailed terms of a purchase-money mortgage or other legal terms beyond the general description of the subject property, the price and the mortgage to be assumed or given. A real estate broker may readily protect himself from a charge of unlawful practice of law by inserting in the document that it is subject to the approval of the respective attorneys for the parties. Moreover, a real estate broker or agent who uses one of the recommended purchase offer forms referred to above, or one recommended by a joint committee of the bar association and realtors association of his local county, who refrains from inserting provisions requiring legal expertise and who adheres to the guidelines agreed upon by the American Bar Association and the National Association of Real Estate Brokers, above noted, has no need to worry about the propriety of his conduct in such transactions.

The purchase offer used by petitioner in this case did not alert the buyer to see his attorney before signing it. Beyond that, however, since the buyers were not assuming a mortgage but were planning to give back a purchase-money mortgage to secure a substantial part of the purchase price, the detailed terms of such mortgage were inserted in the offer by petitioner. In doing this petitioner engaged in the practice of law. Moreover, as broker for the seller, petitioner was in a fiduciary relationship to her *(Matter of Grant Realty v Cuomo, 58 AD2d 251, 255, supra),* presumably seeking the best terms obtainable in the offer for her. In such circumstances it was improper for petitioner to specify that the mortgage be callable in 10 years and contain the ambiguous terms of "prepayment privilege" and "standard default of 30 days". The insertion of those provisions constituted advising the buyer that such terms were normal, reasonable and proper. Furthermore, had petitioner not undertaken to represent the buyers in preparing the contract, the dispute could not have arisen

between petitioner and them as to whether the air conditioners, bar and chairs were included in the contract.

The privilege of brokers to prepare simple real estate contracts, therefore, cannot be extended as far as petitioner undertook to do in this case. Where the insertion of the terms in the contract constitutes the giving of legal advice, the broker or agent must refrain from offering his services therefor.

Real estate brokers and salesmen are, of course, subject to the reasonable surveillance of the Secretary of State (Real Property Law, art 12-A, § 441-c). The scope of our review of the determination of the Secretary of State is limited to ascertaining whether the record contains substantial credible evidence upon which he could reach his conclusion that petitioner demonstrated untrustworthiness and incompetence as a licensed realtor within the provisions of section 441-c of the Real Property Law (*Kostika v Cuomo,* 41 NY2d 673, 676; *Matter of Butterly & Green v Lomenzo,* 36 NY2d 250, 256; *Matter of Grant Realty v Cuomo, supra*). That statute has been declared constitutional as against the charge of vagueness (*Matter of Gold v Lomenzo,* 29 NY2d 468), and the Secretary of State has been granted wide discretion in his determination of what is untrustworthy conduct (*id.,* p 477; and see *Matter of Grant Realty v Cuomo, supra,* p 255).

Upon the record herein we conclude that there is substantial evidence to support respondent's determination that petitioner's acts constituted the practice of law, thus rendering petitioner untrustworthy, and also that petitioner showed incompetence in the transaction. We do not find, however, any evidence to support an inference that petitioner received a fee for its services in preparing the contract document in violation of section 484 of the Judiciary Law.

Petitioner contends that because of the long-standing practice of real estate brokers and agents with respect to preparing purchase offers, the application to it of section 441-c of the Real Property Law without special notice or warning is unconstitutional. The difficulty with such contention is that, as shown by several of the cases above cited, it has long been the law that no one may practice law without a license and that even with respect to documents drawn by brokers or agents in arranging for the sale of real property, acts amounting to the practice of law are forbidden (see *People v Lawyers Tit. Corp.,* 282 NY 513, *supra; People v Title Guar. & Trust Co.,* 227 NY

366, *supra; People v Alfani,* 227 NY 334, *supra).* Because enforcement of such principles has heretofore been lax, petitioner's argument may well be considered with respect to the punishment to be imposed for the violation.

Respondent imposed no punishment upon petitioner except suspension until it return to the buyers the $200 down payment. Petitioner promptly returned the $200, and the suspension was immediately lifted.

█ In light of the previous practice on the part of real estate brokers and agents in respect of real estate contracts, and the narrow line between permitted and forbidden services by them in this area and the prior feeble and erratic enforcement of the statute by the Secretary, we conclude that the action of respondent in suspending petitioner's license was excessive and that the punishment should be reduced to censure only.

The determination should, therefore, be modified accordingly and, as modified, confirmed.

MARSH, P. J., MOULE, CARDAMONE and DILLON, JJ., concur.

Determination unanimously modified, in accordance with opinion by WITMER, J., and as modified, confirmed without costs.